IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Norfolk Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | CRIMINAL NO. 2:10cr57 |
| v. | ) | |
| | ) | |
| | ) | |
| MAXAMAD CALI SACIID, | ) | |
| a/k/a Mohammed Said, | ) | |
| | ) | |
| MOHAMMED ABDI JAMAH, | ) | |
| | ) | |
| JAAMAC CIIDLE, | ) | |
| | ) | |
| ABDICASIIS CABAASE, | ) | |
| | ) | |
| ABDIRASAQ ABSHIR, | ) | |
| | ) | |
| MAHAMED FARRAAH HASSAN, | ) | |
| | ) | |
| Defendants. | ) | |

GOVERNMENT'S RESPONSE TO
DEFENDANT'S JOINT MOTION TO DISMISS COUNT 1

The United States of America, by it attorneys, Neil H. MacBride, United States Attorney

for the Eastern District of Virginia, and Benjamin L. Hatch, Joseph E. Depadilla, and Raymond

E. Patricco, Jr., Assistant United States Attorneys, respectfully submits this response to

Defendants' Joint Motion to Dismiss Count 1 (hereinafter "Motion to Dismiss Count 1").  For

the reasons stated in detail here, the government respectfully submits that the defendants' motion

should be denied.

1

## SUMMARY OF ARGUMENT

The defendants' argument for the dismissal of Count 1 rests upon two propositions. First, that a ship of persons with no lawful authority to engage in hostilities could nevertheless conduct an armed assault of another ship, and just so long as the attackers did not take any item of value from the victim ship, this unauthorized hostility would not constitute piracy.  Second, that in considering whether this conduct is proscribed by the law of nations, as incorporated by Section 1651 of Title 18, this Court is precluded from examining authorities from the last approximately 200 years because Congress would have wanted to lock in the definition of piracy as it existed in 1819.

Neither of those propositions is an accurate statement of the law.  Piracy has historically and consistently included different types of conduct.  One type is robbery on the high seas.  But although such robbery certainly includes robbery as it was defined at English common law, it is not so limited.  Authorities make clear it includes conduct that does not involve taking from another person or in the presence of another person (as required at English common law), and it also includes conduct that does not involve violence or the threat of violence (as required at English common law).  As particularly pertinent here, piracy as defined by the law of nations also does not require the taking of actual property.  An unauthorized armed assault on the high seas is piracy.  In this respect, the crime of piracy is also aimed at preventing unauthorized violence on the high seas, regardless of whether the motive of the assailant is to plunder or simply to destroy.

While the law of nations was clear on this point at least by 1819, there is nothing that precludes this Court from referencing additional authorities on the topic that come after that date.

Section 1651 is best construed as referencing the body of the law of nations that exists at the time of the offense conduct.

## BACKGROUND

On April 10, 2010, around 5:00 a.m., the defendants approached the USS Ashland in a smaller skiff.  The defendants' skiff approached the USS Ashland from the aft.  As the defendants' skiff came up even with the USS Ashland on the USS Ashland's port side, at least one person in the defendants' skiff raised a firearm and began firing at the USS Ashland.  The person continued to fire at the USS Ashland as the defendants' skiff continued to move up the USS Ashland's port side.

The USS Ashland returned fire and the defendants' skiff exploded and burned.  Later, members of the USS Ashland's crew drew close and observed the remains of the defendants' skiff, which was not safe to board due to its condition.  The USS Ashland crew members observed in the skiff, among other things, at least one ladder, a hook, and the remains of an AK-47 style firearm.[1]

## ARGUMENT

The government does not dispute that it is appropriate for the Court to consider at this point the defendants' asserted legal defense that an actual taking of property away from the person or actual seizure of the USS Ashland is necessary to constitute the offense of piracy under Section 1651.  The United States does not dispute that the defendants failed in the course of their attack to engage in a hostile boarding of the USS Ashland; and the United States does not

---

[1] The above background section is not intended to be an exhaustive recitation of the government's anticipated evidence.  The defendants' characterization of their own statements is irrelevant to the legal issue presented and therefore the government does not address it.

dispute that the defendants failed to take actual physical control of the USS Ashland from its crew.

Nevertheless, as explained below, an actual taking of property is not required under the law of nations.  The type of conduct at issue here, an armed assault upon another ship pursuant to no lawful authority, has historically and consistently been understood to constitute the crime of piracy as defined by the law of nations.

I.      **The Definition of Piracy Has Historically and Consistently Included the Defendants' Conduct – Unauthorized and Illegal Acts of Violence on the High Seas By Private Persons for Private Purposes.**

The government organizes its discussion below roughly according to time periods, the first section being the time period leading up to and including the Nineteenth Century and the second section being the time period of the Twentieth and Twenty-First Centuries.  This internal organization is meant to facilitate ease of reference and does not imply a difference in the relevant substantive definition of piracy in these time periods.  As argued below, the conduct at issue in this case has throughout these time periods been understood to constitute the crime of piracy as defined by the law of nations.

A.      **Piracy under the law of nations in the period leading up to and including the Nineteenth Century.**

In 1800, the great John Marshall, then a Congressman and soon to be Chief Justice, gave a famous speech defending President Adams' conduct in the controversial extradition of Jonathan Robbins, who was also referred to as Thomas Nash.  *See* Newmyer, *John Marshall and the Heroic Age of the Supreme Court* 135-38 (2001).  Though the speech was not primarily concerned with piracy, Marshall touched upon the subject and defined piracy as follows:

A pirate, under the law of nations, is an enemy of the human race [*hostis humanis*

4

*generis*].  Being the enemy of all, he is liable to be punished by all.  Any act which denotes this universal hostility, is an act of piracy.  *Not only an actual robbery, therefore, but cruising on the high seas without commission, and with intent to rob, is piracy.*  This is an offense *against every nation*, and is, therefore, alike punishable by all.

*United States v. Robins*, 27 F. Cas. 825, 862 (D.C.S.C. 1799) (reproducing Marshall speech and surrounding debate in House of Representatives) (emphases added).  Marshall's speech won praise from many quarters, including Justice Story.  *Id.* at 860 ("Mr. Marshall (whose speech, as given in a note to Bee's reports, 266, was written out by himself, which is said by Judge Story to be among the very ablest arguments on record . . . .").  Marshall's speech has such enduring value, including its description of piracy, that it has even won praise much more recently from Justice Kennedy.  *See* Speech of Associate Justice Anthony M. Kennedy, United States Supreme Court, at the John Marshall Foundation 250th Gala, p.4 (Sept. 24, 2005) (tape transcription of speech available at www.johnmarshallfoundation.org/pdf/KennedySpeech.doc) ("And incidentally, this paper would be a magnificent paper to give to international law students because he [Marshall] discusses the difference in piracy, which is an offense against all nations, and mutiny and murder, which is an offense principally against the ship of the nation involved. . . . . Read that speech.  It's a superb piece of legal reasoning, by then-Congressman Marshall.").

A number of authorities support the definition of piracy under the law of nations as inclusive of private, unauthorized acts of violence on the high seas.  *See* I Hawkins, Pleas of the Crown, Ch. 10 p.251 (8th ed. 1824) (a pirate is "one who, to enrich himself, either by surprise or open force, *sets upon* merchants or others trading by sea, to spoil them of their goods or treasure; and he is called *hostis humani generis* . . . ." (first emphasis added)); *United States v. Smith*, 18 U.S. 153, 163 fn.h (1820) ("Azuni (Part 2. c. 5. s. 3.) says, 'A pirate is one who roves the sea in

5

an armed vessel without any commission or passport from any prince or sovereign state, solely

on his own authority, and for the purpose of seizing by force, and appropriating to himself

without discrimination, every vessel he may meet."); *id.* ("Molloy (b. 1. c. 4. s. 1.) says, 'A

pirate is a sea thief, or hostis humani generis, who, for to enrich himself either by surprise, or

open force, sets upon merchants or others trading at sea, ever spoiling their lading, if by

possibility they can get the mastery.'"); *The Ambrose Light*, 25 F. 408, 417 (D.C.N.Y. 1885)

(referring to piracy as "private warfare"); *id.* at 417 ("One of the forms of piracy mentioned by

Prof. Perels (Int. Mar. Law, Sec. 16, p. 127) is, 'ships that sail without any flag, or without a flag

sanctioned by any sovereign power; or that usurp a flag, and commit acts of violence under it.'");

*id.* at 423 ("No doubt *indiscriminate violence* and robbery on the high seas are piracy, (U.S. v.

Smith, 5 Wheat. 153, 161;)" (emphasis added)).

The defendants are correct in identifying *United States v. Smith*, 18 U.S. 153, 5 Wheat.

153 (1820), as one of the early seminal decisions on the definition of piracy under the law of

nations.  But the defendants misread *Smith*.  As explained in detail below, *Smith*'s reference to

piracy as "robbery, or forcible depredations upon the sea," was a reference to the basic character

of the piracy offense as distilled from many international sources on piracy, and was not

intended to limit "piracy" in Section 1651 to the specific elements of the common law crime of

robbery.  Moreover, *Smith* did not set out to define every aspect of piracy under the law of

nations, as the *Smith* decision itself and other contemporaneous sources make clear.  In any

event, the offense conduct charged in this case would constitute robbery, as that term was used in

*Smith*, or at the very least a "forcible depredation."  *See Webster's New International Dictionary*

703 (2d ed. 1959) (defining depredate as "to plunder and pillage; to despoil; to lay waste; to prey

upon"); *Webster's Revised Unabridged Dictionary* (1828) (defining depredation as "the act of plundering; a robbing; a pillaging" and depreciate as "to plunder; to rob; to pillage; to take the property of an enemy or of a foreign country; to prey upon; to waste; to spoil").

In *United States v. Smith* (opinion on behalf of the Court by Story, J.), the Supreme Court interpreted an earlier version of the statute charged in Count 1 of this case.  In *Smith*, the jury had found the defendant guilty of the plunder and robbery of a Spanish vessel.  *Id.* at 154.  Of relevance here, the defendant challenged the jury's verdict on the ground that the law of nations failed to define the offense of piracy with reasonable certainty.  *Id.* at 160.

The Supreme Court rejected the defendant's argument.  The Court began its analysis by defining the relevant sources to be consulted in determining the content of the law of nations: "What the law of nations on this subject is, may be ascertained by consulting the works of jurists, writing professedly on public law; or by the general usage and practice of nations; or by judicial decisions recognizing and enforcing that law."  *Id.* at 160-61.  Based on its examination of these sources, the Court concluded that "whatever may be the diversity of definitions, in other respects, all writers concur, in holding, that robbery, or forcible depredations' upon the sea, *animo furandi*, is piracy."  *Id.* at 161.  The Court held that the robbery-or-forcible-depredations-on-the-sea definition was set forth in the law of nations and that the precursor statute to Section 1651 adequately defined the crime.  *Id.* at 162.

Significantly, in *Smith*, the Court considered only whether the law of nations defined piracy with sufficient certainty to support the jury's special verdict rendered in that case – a special verdict which included the jury's finding that the defendant had engaged in the "plunder and robbery" of a Spanish vessel.  That the Court's holding would be so limited arises naturally

from the general rule that the Court addresses only the issues that are before it.  But the *Smith* Court made it clear that it was not attempting to comprehensively define all aspects of the crime of piracy under the law of nations.  First, the Court stated that "*whatever may be the diversity of definitions, in other respects*, all writers concur, in holding, that robbery, or forcible depredations' upon the sea, *animo furandi*, is piracy."  *Id.* at 161 (emphasis added).  In other words, the Court had located an area of consensus sufficient to support its decision and was not attempting to examine other aspects of the definition, some of which may have been generally accepted and some of which may not.  Second, the Court ended an extensive footnote that marshaled authorities supporting the robbery-or-forcible-depredations definition with the statement that those gathered authorities were "submitted to the learned reader to aid his future researches in a path, which, fortunately for us, it has not been hitherto necessary to explore with minute accuracy."  *Id.* at 163 fn.h.

The robbery-and-forcible-depredations definition recognized in *Smith* does in fact support the conclusion that the defendants' conduct in this case falls within the definition of piracy under the law of nations.  By referring to robbery and forcible depradations, the Court did not intend to mandate, for example, the specific elements of those offenses as they would have existed at English common law.  Indeed, the inclusion of "forcible depredations" in the definition of piracy confirms that the Court was using general terminology that could cover a variety of offense conduct.  This is not surprising.  The Court was referencing the law of nations, a law drawn from a variety of sources across a variety of countries over a long period of time; the law of nations is incorporated by domestic common law but is not to be dependant upon it for its content.

This fact is well illustrated by Justice Story's opinion as Circuit Justice in *United States v. Tully*, 1 Gall. 247, 28 F.Cas. 226 (C.C. Mass. 1812). *Tully* involved a prosecution based on a statute that pre-dated the enactment of the precursor to the current Section 1651; the statute at issue in *Tully* declared it piracy for a captain or mariner to steal the ship on which he served. Justice Story approved the instruction earlier given to the jury which included the following description of piracy:

> That, at the common law, the offence of piracy consisted in committing those acts of robbery and depredation upon the high seas, which, if committed on land, would have amounted to felony there. *That it was not necessary by the common law, that the offence should be committed with all the facts necessary to constitute the technical crime of robbery*. That robbery could be committed only by force and violence to the person, or by putting in fear. But any felonious taking or carrying away of a ship, and the property on board thereof, which, if done on land would have amounted to felony, if done at sea, although there were no violence used to the person of the owner or master, and no putting in fear, would, in point of law, be piracy.

*Id.* at 228 (internal citations omitted) (emphasis added). Both Justice Story and District Judge Davis, who together sat on the Circuit Court, approved this instruction.

Judge Davis in fact began his separate opinion in *Tully* by defining piracy under the law of nations in a manner that does not suggest an actual taking is necessary:

> A pirate is one, says Hawkins, who, to enrich himself, either by surprise or force, *sets upon* merchants or other traders, by sea, to spoil them of their goods: this description, as is observed by a respectable writer of our own country, is applicable merely to *piracy by the law of nations*.

*Id.* at 229 (opinion of Davis, D.J.) (emphases added).

Judge Davis rejected the defendants' contention that the victim of the robbery must be put in fear: "This objection is grounded on an analogy to robbery on land; an analogy too strictly pursued in the argument on this head. Even at common law, piracy might be committed without

the characteristics which this objection considers as essential." *Id.* Judge Davis proceeded to give the example of pirates who attack and rob a ship while the entire ship's crew is on shore. This, Judge Davis notes, was considered piracy even though nothing was taken from the person or presence of another by violence or placing the person in fear, as would be required by the common law definition of robbery. *Id.*

While the facts of *Tully* are different from this case, which does involve violence against the person but does not involve the successful taking of property, the fact remains that both judges in *Tully*, including Justice Story, concluded that the term robbery as used in the context of piracy does not contemplate an offense sharing all the elements of common law robbery.

Other Nineteenth Century decisions make clear that the Supreme Court and other federal courts did not consider the actual taking away of property by the defendant to be a necessary element of the crime of piracy under the law of nations. In *The Malek Adhel*, 43 U.S. 210 (1844), Justice Story again writing for the Court considered whether a brig and its cargo could be forfeited under a law providing for the sale and distribution of "any vessel or boat from which any piratical aggression, search, restraint, depredation, or seizure shall have been first attempted or made." *Id.* at 231. This forfeiture law was part of same Act of 1819 that had created the original version of what is now Section 1651; indeed, the forfeiture law was the fourth section of the act and the criminal penalty for piracy under the law of nations was the fifth. *See* Act of March 3, 1819, 3 Stat. 510; *The Malek Adhel*, 43 U.S. at 231.

*The Malek Adhel* involved a strange set of underlying facts wherein the skipper, one Captain Nunez, of the *Malek Adhel* had engaged in a number of attacks and some thefts from other vessels but he did not actually capture any of the vessels at issue; the skipper's motivation

10

for engaging in this conduct was unclear, as Justice Story noted.  *See* 43 U.S. at 233 ("What Captain Nunez designed under his false and hollow pretences and excuses it may not be easy to say, with exact confidence or certainty.").

As pertinent here, the claimants (owners of the *Malek Adhel*) argued that the brig should not be forfeited because in order to be "piratical" the actions of Captain Nunez must have been done with intent to steal or plunder, and not for some other reason.  In other words, the argument was that an attack upon another ship for reasons of spite or mischief did not constitute a piratical assault.  Justice Story, writing for the Court, squarely rejected this argument, concluding that an assault on a ship motivated by hatred, revenge, or wanton abuse of power was piratical:

> A pirate is deemed, and properly deemed, *hostis humani generis*. But why is he so deemed? Because he commits hostilities upon the subjects and property of any or all nations, without any regard to right or duty, or any pretence of public authority.  If he wilfully *sinks or destroys* an innocent merchant ship, without any other object than to gratify his lawless appetite for mischief, it is just as much a piratical aggression, *in the sense of the law of nations*, and of the act of Congress, as if he did it solely and exclusively for the sake of plunder, *lucri causa*.  The law looks to it as *an act of hostility*, and being committed by a vessel not commissioned and engaged in lawful warfare, *it treats it as the act of a pirate*, and of one who is emphatically *hostis humani generis*.

*Id.* at 232 (emphases added to non-Latin terms).[2]  If an attack that sinks or destroys a merchant ship constitutes piracy, then the crime of piracy clearly contemplates an assault that does not involve the carrying away of property by the defendant.

---

[2] Justice Story's references to the law of nations and to pirates as *hostis humanis generis* – the enemies of all mankind – confirm that he was discussing piracy in the context of the law of nations (as well as the statute before the Court).  All nations may prosecute a pirate who violates the law of nations because his crime occurs outside the jurisdiction of any particular nation and he is a *hostis humanis generis*; a pirate whose conduct violates only a specific nation's statute, but not the law of nations, can be prosecuted only in the nation that proscribes his conduct by statute.

The defendants may argue that the sinking or destruction of a vessel involves the taking away of property from the victim and therefore constitutes a species of robbery or more closely approximates the crime of robbery than an attack that does not result in the sinking or destruction of the vessel.  But such as argument would be contrary to the reasoning employed by Justice Story.  Justice Story's reasoning relied not on the ultimate result (sinking or destruction) but on "an act of hostility" committed "by a vessel not commissioned and engaged in lawful warfare." *Id.* at 232.[3]  Justice Story's conclusion, for a unanimous Court, shows that Justice Story's decision in *Smith* was not understood by himself, and should not be construed today, to restrict the universe of conduct constituting piracy under the law of nations to that which constituted common law robbery.

Justice Story's conclusion in *The Malek Adhel* that the forfeiture provision (Section 4) of the Act of 1819 related to violations of the law of nations has been echoed down the years.  In *The Chapman*, 5 F. Cas. 471, 473 (D.C. Cal. 1864), the court described that forfeiture provision, and another forfeiture provisions subsequently enacted in 1861, as follows:

> The act of March 3, 1819 [3 Stat. 512], subjected to capture only those vessels or boats which should commit or attempt any piratical aggression, search, restraint, depredation or seizure, while the supplementary act of 1861 subjects to capture on the high seas, and to seizure in port, vessels built, purchased, fitted out, in whole or in part, or held for the purpose of being employed in the commission of any

---

[3] Nor could the defendants persuasively argue that Justice Story's statements in this respect are mere *dicta*.  While Justice Story did note that some plundering was involved in the case, he did so only after having reached the conclusion that an intent to plunder was unnecessary to make the act piratical.  *Id.* at 232-33.  Accordingly, Justice Story's reference to the factual evidence of plunder can be viewed as an alternative holding.  In any event, Justice Story was a prolific writer on piracy – he authored a number of Supreme Court and Circuit Court decisions on the topic – and if his statement is *dicta*, it is of the most considered type.  *See In re Piracy Jure Gentium* [1934] A.C. 586, 597 (citing the above-referenced statement from *The Malek Adhel*).

such piratical aggression, search, restraint, etc.  It is plain that the piratical acts contemplated in both statutes are the same, the only difference between the acts being, that the earlier statute extends only to vessels which have committed or attempted them, while the later statute includes vessels intended to be employed in committing them.  *That the offenses thus referred to are such only as would be deemed piratical under the laws of nations, is, I think, evident from the language of both statutes.*

(Emphasis added).  The statutes referenced in the above section of *The Chapman* are still law,

codified now at 33 U.S.C. §§ 384 and 385, and both continue to reference piracy as defined by

the law of nations.

Thus, under *The Malek Adhel* and *The Chapman*, piracy under the law of nations includes

piratical *aggression* and *depredation*, whether they be attempted or made.  33 U.S.C. § 384.

Sections 384 and 385 of Title 33 demonstrate that the law of nations definition of piracy, as

understood by Congress and the Courts, extends to acts of violence on the high seas that fall

short of a completed robbery, as that term was understood at English common law.

### B.    Piracy under the law of nations in the Twentieth and Twenty-First Centuries.

In his treatise on International Law, Oppenheim states that "[p]iracy, in its original and

strict meaning, is every unauthorized act of violence committed by a private vessel on the Open

Sea against another vessel with intent to plunder (*animo furandi*)."  1 Oppenheim, International

Law, § 276, p.325 (1905).  Oppenheim quickly adds however that even this definition does not

include all acts that were treated as piratical, and concludes that the best comprehensive

definition is "*every unauthorized act of violence against persons or goods committed on the

Open Sea either by a private vessel against another vessel or by the mutinous crew or

passengers against their own vessel*."  *Id.* at p.326 (emphasis in original).  As particularly

pertinent here, Oppenhem notes that:

> [t]he act of violence need not be consummated: a mere attempt, such as attacking or even chasing a vessel for the purpose of attack, by itself comprises piracy. On the other hand, it is doubtful whether persons cruising in armed vessels with the intention of committing piracies are liable to be treated as pirates before they have committed a single act of violence.

*Id.* at p.329.

In 1934, the Privy Council[4] considered the issue argued by the defendants in this case: "The question whether actual robbery is an essential element of the crime of piracy jure gentium, or whether a frustrated attempt to commit a piratical robbery is not equally piracy jure gentium . . . . ." *In re Piracy Jure Gentium*, [1934] A.C. 586, 586. The Privy Council squarely rejected the argument made by the defendants, concluding that: "Actual robbery is not an essential element in the crime of piracy jure gentium. A frustrated attempt to commit a piratical robbery is equally piracy jure gentium." *Id.* at 588.

The underlying facts of *In re Piracy Jure Gentium* involved two Chinese junks that attacked another Chinese vessel. While the attacking junks chased and fired on the other

---

[4] The Privy Council in *In re Piracy Jure Gentium* was comprised of Viscount Sankey L.C., Lord Atkin, Lord Tomlin, Lord Macmillan, and Lord Wright. The Privy Council has long played an important role in English government, linking legal systems of the Commonwealth countries, the Empire and the United Kingdom itself. Bryan, *Toward the Development of a Caribbean Jurisprudence: The Case for Establishing a Caribbean Court of Appeal*, 7 J. TRANSNAT'L L. & POL'Y 181, 183 (1998). As the British Empire expanded, colonies developed their own local courts with a right of appeal to the Privy Council. *Id.* at 184. The Judicial Committee of the Privy Council was formally established by the Judicial Committee Act 1833. *Id.* at 184. Since then, the Judicial Committee has operated as an independent court of law, composed of the members of the higher judiciary, including the Lords Chancellors, Lord President and ex-Lord Presidents of the Council, Lords of Appeal in Ordinary and Lords Justices of Appeal, ex-Lord Chancellors and retired Lords of Appeals, and senior judges or ex-judges of Australia, New Zealand and other Commonwealth countries from which a right of appeal still lives. Gray & Rees, House of Commons Standard Note SN/PC/3708 (available at http://www.parliament.uk/documents/commons/lib/research/briefings/ snpc-3708.pdf). The Crown may also refer matters to the Judicial Committee for an advisory opinion. *Id.*

Chinese vessel, they were unable to capture it.  In the end, the crews of the Chinese junks were captured and tried for piracy in Hong Kong.  The jury convicted subject to the question whether a person may be convicted of piracy where no robbery had occurred.  The full court of Hong Kong considered that question and concluded that a completed act of robbery was necessary. The defendants were therefore acquitted.  On November 10, 1933, the king referred to the Privy Council the question referenced above.  *Id.* at 587-88.

The Privy Council's analysis of the question involves the review of numerous international sources, including treatise writers and certain of the Supreme Court of the United States decisions referenced above.  The government will not herein repeat the Privy Council's detailed review of these sources.  The government does note that the Privy Council identified numerous sources that define piracy in a manner that includes an attack but does not require a completed act of robbery, including Molloy's treatise from the Seventeenth Century, *id.* at 590-91, Hawkins' treatise from the Eighteenth Century, *id.* at 593, the cases of the *Sarhassan Pirates* and the *Magellan Pirates* from the mid-Nineteenth Century, *id.* at 597-98, and *The Ambrose Light* (referenced above), *id.* at 598.  The Privy Council also addresses decisions describing piracy as robbery, noting that "every case must be read secundum subjectam materiam and must be held to refer to the facts under dispute," *id.* at 591.  In other words, the definition discussed in *United States v. Smith* involved robbery because the case itself involved completed acts of robbery; it was unnecessary for that court to consider whether an attack would suffice.  *Id.* at 596.[5]

---

[5] Notably, the Privy Council also juxtaposes the Supreme Court's decision in *Smith* with the later decision in *The Malek Adhel*, which, as discussed above, speaks of piracy as inclusive of attacks on other vessels.

The Privy Council noted that its conclusion that an attack constitutes piracy under the law of nations was not only supported by the various extant international law sources but also by common sense:

> When it is sought to be contended, as it was in this case, that armed men sailing the seas on board a vessel, without any commission from any State, could attack and kill everybody on board another vessel, sailing under a national flag, without committing the crime of piracy unless they stole, say, an article worth sixpence, their Lordships are almost tempted to say that a little common sense is a valuable quality in the interpretation of international law.

*Id.* at 594.

The defendants may argue that the Privy Council opinion relies on authorities that post-date 1819 and that the opinion itself recognizes that the law of nations has developed over time. But the Privy Council opinion does not state that the answer it reached would have been different in 1819, and it relies on authorities that pre-date 1819. To say that additional authorities have further clarified the issue is not to say that the issue was insufficiently clear in 1819. Indeed, cases and other authorities arising after 1819 usually rely on authorities pre-dating 1819 as the basis for their conclusion that piracy includes unauthorized acts of violence.[6]

In the Twentieth Century there were two international conventions on the law of the sea – the 1958 Geneva Convention on the High Seas and the 1982 United Nations Convention on the Law of the Sea – both of which defined piracy to include the conduct charged in this case.

The 1958 Geneva Convention on the High Seas (hereinafter the "Geneva Convention") sets forth the following definition of piracy:

Piracy consists of any of the following acts:

---

[6] As discussed below, the government does not agree that relevant authorities on piracy are only those pre-dating 1819.

16

> (1)      *Any illegal acts of violence*, detention or any act of depredation, committed for private ends by the crew or the passengers of a private ship . . . , and directed:
>
> (*a*)      On the high seas, *against another ship* or aircraft, *or against persons* or property *on board such ship* . . .;
>
> (*b*)      Against a ship, aircraft, persons or property in a place outside the jurisdiction of any State;
>
> (2)      Any act of voluntary participation in the operation of a ship . . . with knowledge of facts making it a pirate ship . . .;
>
> (3)      Any act of inciting or of intentionally facilitating an act described in subparagraph 1 or subparagraph 2 of this article.

Convention on the High Seas, Sept. 15, 1958, art. 15, 13 U.S.T. 2312, 2317, 450 U.N.T.S. 11, 90 (*available at* http://untreaty.un.org/ilc/texts/instruments/english/conventions/8_1_1958_high_seas.pdf) (emphases added).  For information concerning the states that are signatory to the Geneva Convention and have ratified it, including the United States, see United Nations Treaty Collection, *2. Convention on the High Seas* (*available at* http://treaties.un.org/doc/Publication/MTDSG/Volume%20II/Chapter%20XXI/XXI-2.en.pdf)..

In commentary accompanying the draft version of what became Article 15 above, the International Law Commission noted that "[t]he Commission had to consider certain controversial points as to the essential features of piracy."  II Yearbook of the International Law Commission 282 (1956) (*available at* http://untreaty.un.org/ilc/publications/yearbooks/Ybkvolumes%28e%29/ILC_1956_v2_e.pdf).  Significantly, the inclusion in the piracy definition of "any illegal act of violence" was not among the list of controversial points considered by the International Law Commission.  The International Law Commission did note in its list of controversial points that "(I) The intention to rob (*animus furandi*) is not required.  Acts of piracy may be prompted by feelings of hatred or revenge, and not merely by the desire for gain."  *Id.*  Of course, Justice Story had put that

17

question to rest in the United States long ago in *The Malek Adhel*.

In 1982, the United Nations Convention of the Law of the Sea ("UNCLOS") was opened

for signature.  "This marked the culmination of more than 14 years of work involving

participation by more than 150 countries representing all regions of the world, all legal and

political systems and the spectrum of socio/economic development."  Oceans and Law of the

Sea, Division for Ocean Affairs and the Law of the Sea, United Nations Convention on the Law

of the Sea Overview (*available at*

http://www.un.org/Depts/los/convetion_agreemetns/convention_overview_convention.htm).

While UNCLOS is an expansive examination of the law of the sea, some provisions of which

introduced new legal concepts, UNCLOS Article 101, which defines piracy, supplies the same

definition as that recognized by the Geneva Convention:

> Piracy consists of any of the following acts:
> (a) *any illegal acts of violence* or detention, or any act of depredation, committed
> for private ends by the crew or the passengers of a private ship or a private
> aircraft, and directed:
>> (I)      on the high seas, *against another ship . . ., or against persons* or
> property *on board such ship* or aircraft;
>> (ii)     against a ship, aircraft, persons or property in a place outside the
> jurisdiction of any State;
> (b) any act of voluntary participation in the operation of a ship or of an aircraft
> with knowledge of facts making it a pirate ship or aircraft;
> (c) any act of inciting or of intentionally facilitating an act described in
> subparagraph (a) or (b).

Convention on the Law of the Sea, Dec. 10, 1982, art. 101, 1833 U.N.T.S. 3, 436 (*available at*

http://www.un.org/Depts/los/convention_agreements/texts/unclos_e.pdf) (emphases added).

UNCLOS reflects the collaborative work of many nations over a period from 1973 to 1982.  For

information concerning the states that are signatory to UNCLOS and have ratified it, see United

Nations Treaty Collection, *6.  United Nations Convention on the Law of the Sea*, (*available at*

http://treaties.un.org/doc/Publication/MTDSG/Volume%20II/Chapter%20XXI/XXI-6.en.pdf).

While the United States has not ratified UNCLOS, various aspects of it have been recognized as

reflecting customary international law.  *See United States v. Alaska*, 503 U.S. 569, 588 n.10

(1992) ("the United States has not ratified [the United Nations Convention on the Law of the

Sea], but has recognized that its baseline provisions reflect customary international law"); *United

States v. Royal Caribbean Cruises, Ltd.*, 11 F. Supp. 2d 1358, 1372 (S.D. Fla. 1998) ("it does

appear from the testimony produced in this case, as well as the caselaw in this area, that

UNCLOS is properly considered customary international law").  *See also* Schoenbaum, 1

*Admiralty and Maritime Law* §2-2, at 23-25 (4th Ed. 2004) (examining which portions of

UNCLOS have been recognized by the United States)*;* U.N. Security Council Resolution No.

1851, 1 (2008) ("international law, as reflected in the United Nations Convention on the Law of

the Sea of 10 December 1982 (UNCLOS), sets out the legal framework applicable to combating

piracy and armed robbery at sea") (*available at*

http://www.un.org/Docs/sc/unsc_resolutions08.htm).

   The International Maritime Bureau defines piracy as "an act of boarding or *attempting to

board* any ship with the apparent intent to commit theft or any other crime and with the apparent

intent or capability to use force in furtherance of that act."  Chalk, *The Maritime Dimension of

International Security*, 3 (2008) (emphasis added).

   The Ninth Circuit's recent decision in *United States v. Shi*, 525 F.3d 709 (9th Cir. 2008),

confirms the inclusion of unauthorized acts of violence in the definition of piracy put forth in

*United States v. Smith*.  In *Shi*, the Ninth Circuit held that 18 U.S.C. §§ 2280(a)(1)(A) and (B)

"proscribe offenses which meet the definition of piracy."  *Id.* at 721.  Notably, while Section

2280(a)(1)(A) criminalizes "seiz[ing] or exercis[ing] control over a ship by force or threat thereof or any other form of intimidation," Section 2280(a)(1)(B) criminalizes "*an act of violence against a person on board a ship* if that act is likely to endanger the safe navigation of that ship." (Emphasis added). The Ninth Circuit nevertheless had no trouble in concluding that Section 2280(a)(1)(B), as well as Section 2280(a)(1)(A), were within Congress' power to criminalize crimes of piracy "[b]ecause such offenses involve interference with property on the open sea through the use of force." 525 F.3d at 721. The *sole* authority the Ninth Circuit relied on in support of its conclusion that Section 2280(a)(1)(B) falls within the definition of piracy is none other than *United States v. Smith*'s traditional definition of "piracy" as "robbery, or forcible depredations upon the sea." *Id.* at 721. *See also* Motion to Dismiss Count 1 at 7 (citing *Shi* as a case relying on *Smith*'s traditional definition of piracy). Just as in *Shi*, the conduct charged in this case involves interference with property and persons onboard the USS Ashland through the use of force, and accordingly falls within the traditional definition of piracy as recognized in *Smith*.

## II.   Contrary to the Defendants' Argument, the Court Can Rely on Authorities that Post Date the Year 1819 to Define Piracy.

The defendants argue that the terms "piracy as defined by the law of nations" as used in Section 1651 must be restricted to the meaning of piracy under the law of nations as it existed in 1819 when the original precursor statute to Section 1651 was enacted. Should the Court agree with the United States that the offense of piracy under the law of nations did not, as of 1819, require the taking away of property, or the actual, physical seizure of a ship, then it would be unnecessary to consider whether sources post-dating 1819 can be considered in defining piracy under the law of nations as those terms are used in Section 1651.

20

However, should the Court disagree with the United States on this point, it would then become necessary to reach the issue whether Section 1651's use of the terms "piracy as defined by the law of nations" can be informed by sources, such as the 1934 Privy Council decision in *In re Piracy Jure Gentium*, the 1958 Geneva Convention and the 1982 UNCLOS, that post-date 1819.  As described above, these post-1819 sources clearly support a definition of piracy that would include the conduct charged here – a violent attack against the USS Ashland and its crew.

The defendants argue that this Court must turn a blind eye to all sources defining piracy from the last 200 years.  The defendants base this argument on cases stating that terms in statutes are generally presumed to have the meaning they possess at the time of enactment.  This argument is not sufficient for the defendants, however, because Section 1651, in its present form, was actually re-codified in 1948 and modified in 1909.  *See* June 25, 1948, c. 645, 62 Stat. 774; March 4, 1909, ch. 321, § 290, 35 Stat. 1145.  So, the defendants must go a leap farther to argue that it is the 1819 enactment, as opposed to the 1909 or 1948 enactments, that controls the definition.  To take this leap, the defendants rely on a House Report from the legislative history of Section 1651 and a related Revision Note to Chapter 81 of Title 18.  The defendants' argument is nonsensical; Congress did not intend to exclude 200 years worth or international legal authorities and this Court need not either.

To begin with, the defendants' argument that terms in statutes are presumed to carry the meaning extant at the time of enactment merely begs the question.  The question is whether, by referring to "piracy as defined by the law of nations," Congress intended to (a) take a snapshot of the law of nations at the exact time of the statutory enactment and employ that definition for all time or (b) simply identify the body of law – the law of nations – that would supply the

21

definition of piracy at the time the offense was committed.

There are a number of reasons to conclude that Congress intended the latter approach – that is, that Congress intended to criminalize piracy as defined by the law of nations at the time the offense was committed.  First, if Congress had intended the former "snapshot" approach, it could have clearly expressed that approach by, for example, criminalizing "piracy as defined by the law of nations in the year 1819."

Second, other statutory references to the law of nations have not been construed to be restricted to the law of nations extant at the time of enactment.  For example, in *Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004), the Supreme Court construed the Alien Tort Statute (ATS), 28 U.S.C. § 1350, which vests federal district courts with "original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States."  As pertinent here, the Supreme Court held that the ATS granted federal courts the ability to recognize tort causes of action for violations of the present day law of nations.  542 U.S. at 725 ("we think courts should require any claim based on the present-day law of nations "); *id.* at 729 ("the door is still ajar subject to vigilant doorkeeping, and thus open to a narrow class of international norms today").  In so doing, the Court necessarily rejected the argument that claims authorized by the ATS were only those violations of the law of nations existing at the time the ATS was originally enacted as part of the Judiciary Act of 1789.  And, while the Court ultimately concluded that the alleged law-of-nations tort at issue in the case was not sufficiently widely recognized to constitute a customary international law norm at the present, the Court considered authorities from the Twentieth Century – well after 1789 – on the point.  *See* 542 U.S. at 736 fn.27.

Of further significance, the Court in *Sosa* reaffirmed that "[f]or two centuries we have affirmed that the domestic law of the United States recognizes the law of nations."  542 U.S. at 729 (citing cases).  It would be anomalous if the *present day* law of nations is considered to be part of the law of the land as a matter of federal common law, except where Congress has specifically adopted the law of nations through statute, in which case the law of nations would be frozen at the time of the statutory enactment.  But that would be the consequence if the defendants' argument were accepted.  The defendants' argument also runs afoul of the rule that an act of Congress ought never to be construed to violate the law of nations if any other possible construction remains.  *See Murray v. The Charming Betsy*, 2 Cranch 64, 118 (1804).  As the defendants would have it, Section 1651 should be construed consistent with the 1819 definition of piracy as defined by the law of nations, even if that definition is inconsistent with the definition the law of nations currently supplies for the offense.  If *The Charming Betsy* rule of construction allows a federal court to interpret an act of Congress in a manner consistent with the law of nations even when the statute at issue does not reference the law of nations, it would seem to follow *a fortiori* that a federal court should construe a statute incorporating the law of nations *in a manner consistent with the law of nations*.

Third, other references to the law of nations in Title 18 do not appear to be restricted to that law existing at the time of the enactment.  For example, 18 U.S.C. § 756 criminalizes aiding or enticing a person belonging to the armed forces of a belligerent nation or faction who is interned in the United States in accordance with the law of nations, to escape.  It seems likely that Congress would have intended that reference to apply to any person detained pursuant to the law of nations, even if the law-of-nations basis for detention did not arise until after the

enactment of the statute.  *See also* 18 U.S.C. § 957; 18 U.S.C. § 967.

Fourth, employing the defendants' "snapshot" interpretation could lead to bizarre results such as having the same term "law of nations" mean different things in similar contexts merely by virtue of when the statutes were enacted.  For example, 33 U.S.C. §§ 384 and 385 both reference the law of nations and are both addressed to a similar forfeiture issue, and yet, as the defendants would have it, the courts would have to use the law of nations definition of piracy in 1819 for Section 384 (when an earlier version of Section 384 was first enacted) and the law of nations definition of piracy in 1861 for Section 385 (when it was first enacted).  There is no reason to believe Congress would have intended such a result.

Of course, even assuming *arguendo* that the defendants are right and Section 1651's reference to the law of nations is intended to do a "snapshot" of the law at the time of enactment, that "snapshot" would presumably occur in 1948, when Section 1651 was re-codified in its current form, or at the very least a 1909 "snapshot" when Section 1651 was modified.  The 1948 "snapshot" would have included such sources as *In re Piracy Jure Gentium* and it was roughly contemporaneous with the definition set forth in the 1958 Geneva Convention.  Thus, a 1948 "snapshot" would clearly criminalize the conduct charged in this case.  A 1909 "snapshot" would include all authorities preceding and including the Nineteenth Century discussed above, which authorities constituted the material basis for the decision in *In re Piracy Jure Gentium* in 1934.

Knowing this, the defendants argue that in fact the "snapshot" occurred when the original version of the statute was passed in 1819.  It is worth highlighting that the defendants' theory must be that Congress was so enamored of the 1819 definition of piracy that it would have

wanted to exclude all sources on the law of nations that came after that date, including sources

extant at the times Congress subsequently revised or re-codified the statute in 1909 and 1948.

The defendants' sole source of support for this unlikely argument comes from a revision

note (and an identical House Report) that precedes Chapter 81 of Title 18 and was inserted

during the re-codification process of 1948. *See* Motion to Dismiss Count 1 at 8-9. The revision

note is at best unclear. While it refers to a potential need to revise the law of piracy in light of

international and foreign relations developments, it nowhere states what those developments are

or what revisions would be necessary. In addition, the revision note applies to the entirety of

Chapter 81, not solely to Section 1651, so it is unclear whether Congress had Section 1651

particularly in mind when it penned the revision note. The revision note could, for example,

refer to the need to address aircraft piracy, a topic which was taken up at the Geneva

Convention. Or the revision note could refer to the issue of whether state sanctioned attacks,

such as by submarines on merchant shipping, can constitute piracy; this issue was also

considered in the Geneva Convention and was a matter of interest following the increased use of

submarines for that very purpose in World War II. *See* II Yearbook of the International Law

Commission 282 (1956) (*available at*

http://untreaty.un.org/ilc/publications/yearbooks/Ybkvolumes(e)/ILC_1956_v2_e.pdf )

(discussing decision to exclude from the definition of piracy the sinking of merchant ships by

submarines but acknowledging international disagreement on the topic). A revision note is not

statutory text and an ambiguous revision note to an entire chapter of Title 18 should not be a

basis to construe a specific statute in a manner contrary to the statute's natural reading and with

200 years of pertinent authority from the law of nations.[7]

In any event, the defendants' interpretation of the revision note is a non sequitur.  The defendants' interpretation is that Congress' expression that the piracy laws needed to be assessed in light of present needs meant that Congress wanted to lock in the older 1819 definition of the crime.  It is more reasonable to read the revision note – to the extent it can be construed to refer to Section 1651 at all – as expressing a desire that Section 1651 be construed to encompass modern developments in the law of nations, leaving for another day revisions and modifications that would go beyond piracy as defined by the law of nations.

## III.    Section 1651 Is Not Unconstitutionally Vague as Applied to the Present Charges.

The defendants argue that if Section 1651 is construed to criminalize violent attacks that do not involve the actual taking of property, Count 1 should nevertheless be dismissed because Section 1651 is unconstitutionally vague.

In *United States v. Smith*, Justice Story rejected the claim that defining piracy according to the law of nations was unconstitutionally vague.  For all the reasons provided above, there is a clear and consistent line of authorities that establish that the defendants' conduct constitutes piracy under the law of nations.  These authorities include the Geneva Convention and UNCLOS, which are international agreements that provide fair notice around the world.  The defendants can hardly claim they did not believe an armed assault on another vessel did not put them within the ambit of criminal liability because, despite the clarity of the Geneva Convention and UNCLOS, they acted in reliance on the belief that Section 1651 was restricted to sources

---

[7] The 1948 revision note to Chapter 81 would certainly not bear on the 1909 revision to the statute.

26

preceding 1819.  As was noted in *In re Piracy Jure Gentium*, common sense would indicate that an armed assault is piracy.

The defendants' argument that the failure of a case to previously reach the issue should preclude the charges in this case is simply wrong.  Motion to Dismiss Count 1 at 11.  This issue was addressed in, among other places, *In re Piracy Jure Gentium* in 1934.  Regardless, the law does not require there to be a case directly on point before a criminal statute can be applied to a defendant.  The extensive body of authorities discussed above are more than sufficient to put the defendants on notice that their conduct was criminal.

Accordingly, Section 1651 is not unconstitutionally vague as applied to the charges in this case.

## CONCLUSION

For the foregoing reasons, the defendants' joint motion to dismiss Count 1 of the indictment should be denied.

Respectfully submitted,

Neil H. MacBride
United States Attorney

By:      _____/s/_____
Benjamin L. Hatch
Assistant United States Attorney
United States Attorney's Office
600 East Main Street, Suite 1800
Richmond, Virginia 23219
Phone: (804) 819-5400
Fax: (804) 771-2316
Email: Benjamin.Hatch@usdoj.gov

By:      _____/s/_____

Joseph E. DePadilla
Assistant United States Attorney
Attorney for the United States
United States Attorney's Office
101 West Main Street, Suite 8000
Norfolk, VA 23510
Office Number: 757-441-6331
Facsimile Number: 757-441-6689
E-Mail Address:  joe.depadilla@usdoj.gov


By:      _____/s/_____

Raymond E. Patricco, Jr.
Assistant United States Attorney
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, VA. 22301
Phone: (703) 299-3700
Fax: (703) 299-3982
Email: raymond.patricco@usdoj.gov

<u>Certificate of Service</u>

I hereby certify that on the 21st day of June, 2010, I electronically filed the foregoing with

the Clerk of Court using the CM/ECF system, which will send a notification to the following:

Keith Loren Kimball
Counsel for MAXAMAD CALI SACIID

Robert Bryan Rigney
Counsel for MOHAMMED ABDI JAMAH

Christian Lee Connell
Counsel for JAAMAC CIIDLE

Bruce Christopher Sams
Counsel for ABDICASIIS CABAASE

Trey Robert Kelleter
Counsel for ABDIRASAQ ABSHIR

David Michael Goode
Counsel for MAHAMED FARRAAH HASSAN

                /s/
                Benjamin L. Hatch
                Assistant United States Attorney
                United States Attorney's Office
                600 East Main Street, Suite 1800
                Richmond, Virginia 23219
                Phone: (804) 819-5400
                Fax: (804) 771-2316
                Email: <u>Benjamin.Hatch@usdoj.gov</u>

29